IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN D. BRENTLINGER, II, | ) | CASE NO. 3:18-CV-02452-DAP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| WARDEN DAVID MARQUIS, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION (Doc.** |
| | ) | **No. 1) and ORDER (Doc. No. 10)** |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2. Before the Court is the Petition of John D. Brentlinger, II ("Brentlinger" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Brentlinger is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Brentlinger*, Allen County Court of Common Pleas Case No. CR 2015 0274. For the following reasons, the undersigned recommends that the Petition be DENIED.

Also before the Court is Brentlinger's Motion to Expand the Record. (Doc. No. 10.) For the reasons that follow, the Court DENIES the Motion to Expand the Record.

## I. Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011). The state appellate court summarized the facts underlying Brentlinger's conviction as follows:

1

{¶ 2} On July 16, 2015, Brentlinger was indicted on one count of theft in violation of R.C. 2913.02(A)(1), R.C. 2913.02(B)(2); one count of felonious assault in violation of R.C. 2903.11(A)(2), 2903.11(D)(1)(a); one count of kidnapping in violation of R.C. 2905.01(A)(3), 2905.01(C)(1); one count of kidnapping in violation in of R.C. 2905.01(A)(2), 2905.01(C)(1); one count of aggravated robbery in violation of R.C. 2911.01(A)(1), 2911.01(C); one count of tampering with evidence in violation of R.C. 2921.12(A)(1), 2921.12(B); and one count of extortion in violation of 2905.11(A)(1), 2905.11(B). Doc. 1. The acts forming the basis of this indictment were alleged to have occurred between the dates of January 5, 2015, and January 15, 2015. *Id.* The trial on these charges occurred between the dates of March 1 and March 4, 2016.

{¶ 3} At trial, Joseph Croft ("Croft"), the alleged victim in this case, testified that he had a business relationship with Brentlinger that soured and ended sometime in 2011 or 2012. Tr. 141. Since that time, Brentlinger has asserted that Croft owed him $50,000, but Croft has disputed this claim. Tr. 149. On the night of January 5, 2015, Croft left Elite Truck and Auto, which is the business where he worked, to go to an auction. Tr. 142. After Croft attended the auction, he returned to Elite Truck and Auto and discovered that a snow plow that had been in the parking lot was now missing. Tr. 143. Croft went inside and reviewed the security tapes from that evening. Tr. 144–145. On the tape, Croft saw Brentlinger drive up, get out of his truck, and take the plow. *Id.* Ex. 1. Croft testified that he had not given Brentlinger permission to take the plow. Tr. 147.

{¶ 4} Croft testified that he then called Brentlinger and told him that he would notify the police if Brentlinger did not return the snowplow. Tr. 148. Croft testified that Brentlinger responded to this demand by saying, "I am the f'ing law." *Id.* After he reported Brentlinger to the police, Croft began searching for the snow plow and drove to the old Gomer bank building, which is a place where Brentlinger occasionally stayed. Tr. 151. When he arrived at that location, Croft remained in his vehicle and saw Brentlinger outside of the building, but Croft did not see the snow plow. Tr. 152. Ex. 17. Roughly thirty minutes after Croft arrived, Brentlinger got into his vehicle and began driving away. Tr. 152. Croft, hoping to find the snow plow, followed Brentlinger onto U.S. Route 30. *Id.* Croft trailed Brentlinger into a rest area, parking his vehicle at a distance where he could still see Brentlinger's truck. Tr. 159. At trial, Croft testified that he remained in his vehicle after Brentlinger walked out of view and occupied himself on his phone, looking up periodically to see if Brentlinger's vehicle was still in the parking lot. Tr. 159.

{¶ 5} After five to seven minutes, Croft said he caught something out of the corner of his eye. *Id.* He turned to look and saw Brentlinger standing outside the passenger side of Croft's vehicle with a gun pointed at Croft through the window. *Id.* Brentlinger then told Croft to unlock the vehicle door. *Id.* After Croft refused, Brentlinger walked around the front of the vehicle with the gun pointed at Croft the entire time and approached the front, driver's side door.

Tr. 159–160. Brentlinger attempted to open the door, which was still locked. Tr. 160. He then placed his gun against the window and said, "Unlock the f'ing door." *Id.* When Croft refused, Brentlinger fired his gun into the air, which prompted Croft to unlock the door. *Id.* As soon as the door was unlocked, Brentlinger pulled the door open, grabbed Croft, dragged him out of the vehicle, and struck him on the head with the gun. *Id.* At this time, the keys were in the ignition and the vehicle was running. Tr. 163. Once Croft was out of his vehicle, Brentlinger hit him again and smacked his face, saying, "Do you think this is a game? I want my f'ing money." Tr. 160. Brentlinger then said, "Take off your clothes. I know you're wired. I know you're working for the cops." Tr. 161.

{¶ 6} Croft testified that Brentlinger, at this point, ordered him to walk to the back of the truck. Tr. 162–163. Croft refused, and Brentlinger, with the gun two feet away from Croft's head, fired another shot into the air. *Id.* Croft tried to get to his phone to dial 9–1–1, but Brentlinger took Croft's phone and shot it two times on the ground. Tr. 162. Brentlinger again told Croft to take his clothes        off,        and        Croft        again        refused        to        follow        these instructions. *Id.* Brentlinger then fired another shot into the air and said, "The next one is going in you," "I suggest you start walking." Tr. 163. After firing yet another shot into the air, Brentlinger pushed Croft, and Croft began walking backwards away from Brentlinger. *Id.*

{¶ 7} When Croft had taken roughly ten steps, Brentlinger walked three or four steps backwards, got inside Croft's vehicle, and drove across the parking lot to his vehicle. *Id.* Upon reaching his vehicle, Brentlinger got out, grabbed something from his truck, and got back into Croft's vehicle. Tr. 164. Croft testified that another person was in Brentlinger's truck. *Id.* This other person allegedly drove Brentlinger's truck away while Brentlinger drove Croft's vehicle to a place just outside of the rest area where he parked it. *Id.* Croft testified that his vehicle was recovered later that night after Croft reported this incident to the police. Tr. 164–165. Croft said that his keys were missing, and his vehicle had to be towed to his workplace. Tr. 166, 168.

{¶ 8} Over the next few days, Croft cooperated with the police to record several phone conversations between himself and Brentlinger. Tr. 169. The prosecution introduced the recorded conversations between Croft and Brentlinger, which were facilitated by Detective Mark A. Baker ("Detective Baker"). Tr. 294–295. In one of these conversations, Brentlinger stated,

> **What happened the other night, my friend, was an act of God that you didn't wind up dead on the side of the highway. Okay? That was God saving your life from me killing you. Okay? The first thing you need to do is get on your knees and thank Jesus because you're still alive. That was him that saved your life not me * * *.**

3

Ex. 16. In another conversation, Brentlinger said, "If you didn't follow me, it wouldn't have happened * * *. You need to be thankful you're alive." Ex. 17. When Croft brought up the subject of his phone, Brentlinger said, "Your media card is in front of a f* * * * *g snow plow somewhere in Cleveland." *Id.*

{¶ 9} Brentlinger also testified at trial. He claimed that he had a meeting with Croft at a restaurant on January 3, 2016. Tr. 429, 431. At this meeting, Brentlinger raised the issue of the money that Croft allegedly owed him. Tr. 432. In response, Brentlinger claimed that Croft gave him permission to take a snow plow from the parking lot of Elite Truck and Auto, saying,

> **Look, off the record strictly * * * the plow is sitting out back of the shop. If you have a truck with wasp wiring and a mount, go get it * * * I'm not going to bless the fact that I told you to go get it. I'm not going to say that I told you to go get it. I'm not going to record it. I'll get it replaced with a new one and down the road I go.**

Tr. 433. Tr. 428. On January 5, 2016, Brentlinger went to the parking lot of Elite Truck and Auto and took the snow plow while Croft was away. Tr. 135, 436. Brentlinger said that he then dropped off the snowplow and drove to where he had been staying at the old Gomer bank building. Tr. 438–439. He left Gomer, Ohio to go to Kirtland, Ohio, getting on U.S. Route 30. Tr. 440.

{¶ 10} As he drove, Brentlinger noticed that someone seemed to be following him. Tr. 154, 444. He sped up, but the vehicle continued to trail him. Tr. 445. Brentlinger decided to pull into a rest area, located on U.S. Route 30 in Allen County, to see if the person behind him would follow him. *Id.* Brentlinger stated that he was unaware of the identity of the person who was following him at the time he pulled off into the rest area and claimed that no one else was with him inside his truck that night. Tr. 447. After he parked, Brentlinger got out of his truck to investigate this situation. *Id.* He walked "behind the rest area, through the woods and out in the cornfield." Tr. 448. He then hid behind a pole fifty to sixty feet away from Croft's vehicle and looked to see who was inside the vehicle. *Id.* From this distance, he was able to identify the driver as Croft. *Id.*

{¶ 11} Brentlinger admitted that he then walked up to Croft's vehicle with his gun fully visible to Croft and said, "Roll the window down." Tr. 448, 458, 469. He then asked Croft, "Do you have a gun on you? What are you doing? What's your problem?" Tr. 448. Croft replied, "No, I don't have a gun on me. I just want to talk to you." *Id.* Brentlinger then said, "Well, why don't you step out of the vehicle, to the back of the vehicle, and we'll talk." *Id.* Brentlinger testified that he met Croft at the back of Croft's vehicle where they began to argue over the money Brentlinger claims Croft owed him. Tr. 449–450. Brentlinger denied that he shot Croft's phone but did admit that he discharged his gun that night. Tr. 451, 458. According to Brentlinger,

4

Croft took a swing at him while they were at the back of Croft's vehicle and "caught" Brentlinger's nose, causing Brentlinger to discharge his firearm into the ground. Tr. 451. Later at trial, Brentlinger characterized this as a "warning shot" fired "behind [his] back." Tr. 483. In response to this blow, Brentlinger testified that he said to Croft, "Now we're done. Okay. You start walking. I'm leaving. Otherwise, I'm going to shoot you. You've threatened me. I am done. Game over." *Id.* Brentlinger then testified that he locked Croft out of his vehicle and then left the rest area, driving to Medina where he stayed the night. Tr. 452.

{¶ 12} On January 6, 2015, Brentlinger received a call from Detective Baker, who was assigned to investigate Croft's complaint. Detective Baker called Brentlinger to inform him that Croft had filed a report of the incident that had occurred on January 5, 2015. Tr. 280. Ex. 14. During this conversation, which was recorded, Detective Baker asked Brentlinger what had happened on the night of January 5, 2015. In response, Brentlinger said that "[Croft] was advised that following me was a bad idea." Ex. 14. Brentlinger also denied that he fired a gun and claimed that he did not hit Croft with his gun. Ex. 14. When Detective Baker stated that Croft had a lump on his head, Brentlinger insisted that no physical altercation occurred between him and Croft. *Id.* When asked at trial whether the recorded conversation was a "fair and accurate" representation, Brentlinger said, "It was recorded. We listened to it yesterday. Partially. It depends on your fair and accurate." Tr. 454.

{¶ 13} Following his conversation with Detective Baker, Brentlinger spent most of the day of January 6, 2015, stranded at Kirtland College because he "punctured a tire" on their campus and ended up spending "ten hours trying to get [his] tire fixed." *Id.* The next day—January 7, 2015—Brentlinger testified that he continued his journey through Ohio. As he was driving through Mansfield, Ohio, which is in Richland County, he testified that he "had * * * an epiphany. I thought 'why not send one of these pistols back to the house'?" Tr. 455, 459. Consequently, Brentlinger disassembled one of his guns and shipped the parts in two different packages from Mansfield, Ohio to his home in Tennessee. Tr. 455, 215. Brentlinger testified that he sent all of the parts of the gun except for the barrel and the slide receiver. Tr. 455. When asked why he shipped the gun from Mansfield to his home in Tennessee, Brentlinger testified that "it [was] a diversion." Tr. 455.

{¶ 14} At trial, Shanda Pearson ("Pearson")—a postal worker in Tennessee who delivers mail to Brentlinger's house—testified that, on January 7, 2015, she was contacted by Brentlinger's wife, Lynette Brentlinger ("Lynette"), regarding this package. Tr. 210–211, 213–214. In her testimony, Pearson stated that Lynette asked her to intercept a package that was on its way to the Brentlingers' house. Tr. 212. Pearson explained to Lynette that she could not seize a package without a reason. Tr. 213. Pearson asked, "Why do you not want this package delivered to your house? She told me that—." *Id.* At this moment, the defense counsel objected on grounds of hearsay. The prosecution

argued that this statement was "not to prove the truth of the matter asserted" and was "just to show what [Pearson] did and what course of action she took from there." Tr. 213. The trial court overruled the objection of the defense, issuing an instruction to the jury that this statement is "not being offered for the truth of the matter asserted * * *. You can't take the statement of what was said in the statement, but that it just explains why [Pearson] did what she's doing." *Id.* Pearson then testified that Lynette said,

> **John [Brentlinger] * * * was mailing a gun back to their house that he had used in a crime in Ohio, that he had assaulted a man with it and shot at the man, shot the phone the man had with the gun, and that he had thought at the time the cops had the shell casings and so he was mailing the gun back to her to hide and she did not want any part of it. She did not want the gun delivered to her house because she was scared for her and her children.**

Tr. 214. Pearson then notified the postal inspectors regarding what Lynette had reported. Tr. 214. In response to this report, postal inspector, David Wilson, obtained a search warrant, opened the two packages, and found the disassembled handgun. Tr. 227–228. Wilson testified at trial that the barrel of the gun was not in either package. Tr. 229.

{¶ 15} A gun barrel that matched this weapon was later discovered by police in a storage locker that was owned by Brentlinger and located in Kentucky. Tr. 246, 249. In his testimony, forensic expert Kevin Kramer ("Kramer") said that he assembled the gun that Brentlinger had mailed using the barrel that was found in Kentucky. Kramer then tested the firearm and examined the three shell casings that Detective Baker had recovered at the rest area on U.S. Route 30 on April 1, 2015. Tr. 291, 371–373. Based on his testing, Kramer was able to conclude that all three shell casings were cycled through the firearm that Brentlinger shipped to his house. Tr. 371–372. Kramer testified that he was further able to determine conclusively that at least one of the shell casings had been fired through the barrel that police recovered in Brentlinger's storage locker. *Id.* During cross examination, however, Brentlinger had claimed that the gun he shipped to his home in Tennessee was not the weapon that he fired on the night of January 5, 2015, though he also admitted that the three shell casings found at the rest area had been cycled through the weapon he mailed. Tr. 469, 493, 495. He further admitted that he did not have any evidence that would suggest that the breach imprints on the shell casings were not made by the firearm that he sent to Tennessee. Tr. 458–459.

{¶ 16} During closing arguments, the defense asserted that the State failed to prove venue for the charge of tampering with evidence because the prosecution only proved that the alleged criminal conduct occurred in Richland County, Ohio, not Allen County, Ohio. Tr. 546. The prosecution objected on the grounds that the defense was making an argument that was

"contrary to law." Tr. 547. In response, defense counsel contended that Brentlinger must be acquitted unless the State can prove that the defendant committed the acts forming the basis of this charge in Allen County, Ohio. Tr. 586. After hearing the arguments from the defense and prosecution, the trial judge said, "I think it's a factual determination. The jury should decide the case." Tr. 599. Accordingly, the trial judge included the following in the jury instructions:

The State must prove beyond a reasonable doubt with respect to each count either that all or any part of the offense was committed in Allen County, Ohio; or, that all or any part of the offenses involved in the defendant's course of conduct occurred in Allen County, Ohio. In order for you to find that a course of conduct existed, you must find beyond a reasonable doubt that: the offenses involved the same victim; the offenses were committed as part of the same chain of events in furtherance of the same purpose or objective; the offenses involved the same or a similar scheme or plan; or, the offenses were committed along the defendant's line of travel in this state, regardless of his point of origin or destination * * *.

Tr. 609. On the count of tampering with evidence, the jury "[found] that the State DID prove beyond a reasonable doubt that Allen is the correct county in which the trial should be held." Tr. 644.

{¶ 17} The jury returned a verdict of not guilty for the charged theft of the snowplow but found Brentlinger guilty of all of the remaining charges. Doc. 236 at 4. At the sentencing hearing, the trial judge found that the count of kidnapping in violation of R.C. 2905.01(A)(3) merged with the count of kidnapping in violation of R.C. 2905.01(A)(2). *Id.* at 12. The prosecution elected to proceed with the count of kidnapping in violation of R.C. 2905.01(A)(3). *Id.* at 13. The trial judge then found that the count of felonious assault in violation of R.C. 2903.11(A)(2) merged with the count of kidnapping in violation of R.C. 2905.01(A)(3). *Id.* at 18. At this juncture, the prosecution elected to proceed with the count of kidnapping in violation of 2905.01(A)(3). *Id.* Brentlinger was then sentenced by the trial court on April 19, 2016. Doc. 236. He filed a notice of appeal on May 11, 2016. Doc. 2.

*State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, 204-09 (Ohio Ct. App. 2017) (emphasis in original)

(footnote omitted).

## II.    Procedural History

### A.    Trial Court Proceedings

On July 16, 2015, an Allen County grand jury indicted Brentlinger on one count of theft in violation of O.R.C. § 2913.02(A)(1)/2913.02(B)(2); one count of felonious assault in violation of O.R.C. §

7

2903.11(A)(2)/2903.11(D)(1)(a) with a firearm specification; one count of kidnapping in violation of O.R.C. § 2905.01(A)(3)/2905.01(C)(1) with a firearm specification; one count of kidnapping in violation of O.R.C. § 2905.01(A)(2)/2905.01(C)(1) with a firearm specification; one count of aggravated robbery in violation of O.R.C. § 2911.01(A)(1)/2911.01(C) with a firearm specification; one count of tampering with evidence in violation of O.R.C. § 2921.12(A)(1)/2921.12(B) with a firearm specification; and one count of extortion in violation of O.R.C. § 2905.11(A)(1)/2905.11(B) with a firearm specification.  (Doc. No. 6-1, Ex. 1.)

Brentlinger, through counsel, filed several pretrial motions.  On October 15, 2015, Brentlinger filed a motion to suppress statements he made to law enforcement.  (Doc. No. 6-1, Ex. 3.)  The State filed a response in opposition (Doc. No. 6-1, Ex. 4), to which Brentlinger replied (Doc. No. 6-1, Ex. 5).  Also on October 15, 2015, Brentlinger filed a "Motion to Suppress Search of Package," which he supplemented on November 16, 2015.  (Doc. No. 6-1, Ex. 6, 7.)  The State filed a response in opposition (Doc. No. 6-1, Ex. 8), to which Brentlinger replied (Doc. No. 6-1, Ex. 9).  After conducting suppression hearings, the trial court denied both of Brentlinger's motions to suppress.  (Doc. No. 6-1, Ex. 10.)

On November 2, 2015, Brentlinger filed a motion in limine to exclude from evidence a partial handgun found by the United States Postal Service, which he supplemented on November 16, 2015.  (Doc. No. 6-1, Ex. 11, 12.)  The State filed a response in opposition (Doc. No. 6-1, Ex. 13), to which Brentlinger replied (Doc. No. 6-1, Ex. 14).  On December 29, 2015, the trial court denied this motion in limine.  (Doc. No. 6-1, Ex. 15.)

Also on November 2, 2015, Brentlinger filed a motion in limine in regards to bullets/casings.  (Doc. No. 6-1, Ex. 21.)  The State filed a response in opposition. (Doc. No. 6-1, Ex. 22.)  On December 29, 2015, the trial court denied this motion in limine.  (Doc. No. 6-1, Ex. 23.)

On January 14, 2016, Brentlinger filed a motion to suppress the search of storage lockers for guns.

(Doc. No. 6-1, Ex. 16.)  The State filed a reponse in opposition (Doc. No. 6-1, Ex. 17), to which Brentlinger replied (Doc. No. 6-1, Ex. 18).  On February 4, 2016, Brentlinger filed a supplemental reply. (Doc. No. 6-1, Ex. 19.)  On February 9, 2016, the trial court overruled Brentlinger's motion to suppress. (Doc. No. 6-1, Ex. 20.)

On February 24, 2016, upon the State's oral motion and with no objection by Brentlinger, the trial court amended Count One of the indictment (Theft) to include Elite Truck & Car Sales as a victim.  (Doc. No. 6-1, Ex. 24.)

On March 2, 2016, Brentlinger filed a motion in limine regarding jury instructions, stating he was claiming self-defense as Counts Two (Felonious Assault) and Three (Kidnapping).  (Doc. No. 6-1, Ex. 25.)  On March 4, 2016, Brentlinger filed a brief raising issues regarding jurisdiction and venue. (Doc. No. 6-1, Ex. 26.)

The case proceeded to jury trial on March 1, 2016.  (Doc. No. 6-2, Vol. 2.)  During trial, the State orally moved to delete the firearm specification attached to the Extortion charge in Count Seven, which the trial court granted.  (*Id.* at PageID #363-64.)

On March 4, 2016, the jury found Brentlinger not guilty of Theft but guilty of Felonious Assault with a firearm specification, both Kidnapping counts with firearm specifications, Aggravated Robbery with a firearm specification, Tampering with Evidence with a firearm specification, and Extortion.  (Doc. No. 6-1, Ex. 27.)

On March 9, 2016, through counsel, Brentlinger filed post-trial briefs regarding inconsistent verdicts (Doc. No. 6-1, Ex. 28) and merger (Doc. No. 6-1, Ex. 30).  The State filed responses to both briefs.  (Doc. No. 6-1, Ex. 29, 31.)

On April 19, 2016, the state trial court held a sentencing hearing.  (Doc. No. 6-1, Ex. 32.)  The trial court entered, based on merger and the State's elections, a final conviction and sentence on Counts Three,

9

Five, Six, and Seven.  (*Id.*)  The trial court sentenced Brentlinger to the following terms of imprisonment: eight years on Count Three, plus an additional mandatory three-year term for the firearm specification; six years on Count Five, plus an additional mandatory three-year term for the firearm specification; twenty-four months on Count Six, plus an additional mandatory one-year term for the firearm specification; and thirty months on Count Seven.  (*Id.*)  The sentences were to be served consecutively.  (*Id.*)

**B.     Direct Appeal**

Through new counsel, Brentlinger filed a timely notice of appeal to the state appellate court.  (Doc. No. 6-1, Ex. 33.)  In his appellate brief, he raised the following assignments of error:

I.     APPELLANT WAS CONVICTED OF KIDNAPPING IN THE ABSENCE OF EVIDENCE SUFFICIENT TO SUPPORT A FINDING OF GUILTY IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

II.    APPELLANT'S CONVICTION FOR KIDNAPPING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION.

III.   THE INTRODUCTION OF UNFAIRLY PREJUDICIAL HEARSAY STATEMENTS DURING APPELLANT'S TRIAL VIOLATED HIS RIGHTS TO CONFRONTATION AND DUE PROCESS AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND WAS CONTRARY TO THE OHIO RULES OF EVIDENCE.

IV.    APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE MUST BE OVERTURNED BECAUSE THE STATE FAILED TO PROVE VENUE.

(Doc. No. 6-1, Ex. 34.)  The State filed a brief in response (Doc. No. 6-1, Ex. 35), to which Brentlinger replied (Doc. No. 6-1, Ex. 36).

On May 1, 2017, the state appellate court affirmed Brentlinger's convictions.  (Doc. No. 6-1, Ex. 37.)  *See also State v. Brentlinger*, 90 N.E.3d at 204.

On June 15, 2017, Brentlinger, through counsel, filed a Notice of Appeal with the Supreme Court of Ohio.  (Doc. No. 6-1, Ex. 38.)  In his Memorandum in Support of Jurisdiction, Brentlinger raised the following Propositions of Law:

I.    A CRIMINAL DEFENDANT'S RIGHT TO DUE PROCESS, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION, IS VIOLATED WHEN CONVICTED OF KIDNAPPING IN THE ABSENCE OF EVIDENCE SUFFICIENT TO SUPPORT A FINDING OF GUILTY.

II    A CRIMINAL DEFENDANT'S RIGHT TO DUE PROCESS, AS GUARANTEED BY THE OHIO CONSTITUTION, IS VIOLATED WHEN CONVICTED DESPITE THE GREATER WEIGHT OF THE CREDIBLE EVIDENCE AT TRIAL SUPPORTING A FINDING OF NOT GUILTY.

III.   THE INTRODUCTION OF UNFAIRLY PREJUDICIAL HEARSAY STATEMENTS TO A JURY IS CONTRARY TO THE OHIO RULES OF EVIDENCE, AND VIOLATES A CRIMINAL DEFENDANT'S RIGHTS TO CONFRONTATION AND DUE PROCESS, AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

IV.   CONVICTION FOR AN OFFENSE, WHERE THE STATE HAS FAILED TO PROVE VENUE, VIOLATES A CRIMINAL DEFENDANT'S RIGHTS AS GUARANTEED BY THE OHIO CONSTITUTION.

(Doc. No. 6-1, Ex. 39.)  The record contains no response by the State.  (*See* Doc. No. 6-1.)

On January 31, 2018, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac.R. 7.08(B)(4).  (Doc. No. 6-1, Ex. 40.)

## C.    Federal Habeas Petition

On October 17, 2018,[1] Brentlinger filed a Petition for Writ of Habeas Corpus in this Court and asserted the following ground for relief:

**GROUND ONE**:  PETITIONER WAS DENIED HIS CONFRONTATION RIGHTS AND HIS RIGHT TO DUE PROCESS, AS GUARANTEED BY THE FIFTH, SIXTH,

---

[1] Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  While the Petition herein did not arrive at the Court for filing until October 24, 2018, Brentlinger states that he placed it in the prison mailing system on October 17, 2018.  (Doc. No. 1 at 7.)  Thus, the Court will consider the Petition as filed on October 17, 2018.

AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
WHEN THE TRIAL COURT ALLOWED THE INTRODUCTION OF PREJUDICIAL
HEARSAY TESTIMONY TO THE JURY.

> **Supporting Facts**: [See Attached Answer to Question 12 (a)]

(Doc. 1.)

On January 17, 2019, Warden David Marquis ("Respondent") filed his Return of Writ. (Doc. No.
6.)  Brentlinger filed a Traverse on February 22, 2019.  (Doc. No. 8.)  Respondent filed a Reply to the
Traverse on March 4, 2019.  (Doc. No. 9.)

On November 21, 2019, Brentlinger filed a Motion to Expand the Record.  (Doc. No. 10.)
Respondent filed a response in opposition (Doc. No. 11), to which Brentlinger replied (Doc. No. 12).

### III. Review on the Merits[2]

**A.    Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),
28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of
AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. § 2254(d) (1996).

---

[2] Respondent concedes Brentlinger filed his Petition timely and exhausted his claims as required by 28
U.S.C. § 2254(b)(1)(A).  (Doc. No. 6 at 14.)

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court. *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012). *See also Lopez v.Smith*, ––– U.S. ––––, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel*, 838 F.3d at 695. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This

13

standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 F. App'x 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

## 1.    Ground One

### a.    Confrontation Clause

Brentlinger acknowledges the state appellate court addressed his argument on the merits on rejected it.  (Doc. No. 1 at PageID #29.)  However, he asserts:

> Contrary to the Appellate Court's determination, the analysis given by that Court clearly reflects that at the time of the above conversation, Mrs. Brentlinger, if believed, was fully aware that her husband was sending the parts of a firearm that, according to her, was used in a crime. *Id.* at 54.  Ms. Pearson's testimony further shows that she informed Mrs. Brentlinger that she could not just stop the package without "more information." *Id.* at 47.
>
> At that point, it was clear that Mrs. Brentlinger would have to disclose the alleged crime.  Thus, there can be no dispute she was fully aware that the

14

Postal Authorities would get involved once she told Ms. Pearson that the "package" was related to criminal activity in Ohio.

In light of the facts that were presented to the Ohio Appellate Court, their determination runs afoul of the United Stated [sic] Supreme Court decision in *Clark* supra, sufficient to satisfy 28 U.S.C. §2254(d)(1)'s unreasonable application of clearly established law standard.

(*Id.*)  Brentlinger also maintains that because the state appellate court cited the United States Supreme Court's decision in *Crawford v. Washington* instead of *Ohio v. Clark* "as controlling authority" and failed to consider the "primary purpose" test announced in *Clark*, "any determination should, at a minimum, be considered contrary to that controlling authority under 2254(d)(1)."  (*Id.* at PageID #31-32.)

Brentlinger also argues the state appellate court's decision violated § 2254(d)(2):

Additionally, the reasoning of the Ohio Appellate Court is more then [sic] sufficient to satisfy 28 U.S.C. §2254(d)(2)'s unreasonable determination of the facts in light of the evidence presented to that Court.  Statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  *Clark*, at 822, 126 S. Ct. 2266.

* * *

Mrs. Brentlinger's statements to Ms. Pearson "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation."  Thus, they are considered testimonial." *Bryant*, 562 U.S. at 357.  There was "no emergency in progress.  The [postal worker] questioning [Mrs. Brentlinger] was not seeking to determine . . .  what is happening, but rather what happened."  *Bryant*, 562 U.S. at 357.

The fact that Mrs. Brentlinger's statements to the postal worker were testimonial is buttressed by the fact the State issued Mrs. Brentlinger a subpoena – a subpoena that did not result in Mrs. Brentlinger actually appearing to give testimony at trial.

(*Id.* at PageID #30.)

Respondent asserts:

Brentlinger has not shown that the challenged testimony had a substantial and injurious effect and he is not entitled to federal habeas relief.  *See Hutton v. Mitchell*, 839 F.3d 486, 501-502 (6th Cir. 2016.)  Additionally, Brentlinger

has not established that the state appellate court's decision is contrary to, or an unreasonable application of the clearly established Supreme Court precedent pertaining to the Confrontation Clause, federal due process, and harmless error analysis.

(Doc. No. 6 at 25.)  Therefore, Respondent maintains, this Court must defer to the state appellate court's rejection of Brentlinger's Sixth Amendment and due process claims, as well as its harmless error analysis, and "deny and dismiss" Brentlinger's Petition with prejudice.  (*Id.*)  Respondent failed to address Brentlinger's arguments that the state appellate court utilized the wrong standard to analyze his Confrontation Clause claim.  (Doc. No. 6.)

In his Traverse, Brentlinger maintains that Pearson's "rendition of what Mrs. Brentlinger told her was also the only evidence introduced to the jury that connected Brentlinger to the firearm and shell casings.  All other testimony regarding the shell casings, the gun barrel allegedly found in Kentucky, and the disassembled firearm recovered by the postal inspectors, simply did not establish that Brentlinger committed a crime in Ohio."  (Doc. No. 8 at 8.)  Brentlinger argues, "the only other person to alleged [sic] that Brentlinger committed a crime in Ohio was the alleged victim, Joseph Croft, and his testimony was suspect for numerous reasons, including his past dealings and the $50,000 debt he owed to Mr. Brentlinge[r]."  (*Id.*)

In his reply to the Traverse, Respondent argues:

> There is no clearly established Supreme Court precedent with materially indistinguishable facts establishing that the questioned testimony in Brentlinger's case is testimonial and subject to mandatory exclusion based on the Confrontation Clause.
>
> * * *
>
> Furthermore, Brentlinger's arguments ignore the state trial court's use of a limiting instruction and the state appellate court's reasonable determination that there was constitutionally sufficient evidence to convict Brentlinger.

(Doc. No. 9 at 2-3) (citations omitted).

The record reflects Brentlinger raised this Confrontation Clause and due process claim on direct appeal to the both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 6-1, Ex. 34, 39.) The state appellate court addressed the claim as follows:

{¶ 42} In his third assignment of error, Brentlinger argues that the trial court erred in admitting prejudicial hearsay. He points to a portion of Pearson's trial testimony in which she stated what Lynette Brentlinger told her. These statements read as follows:

**John [Brentlinger] * * * was mailing a gun back to their house that he had used in a crime in Ohio, that he had assaulted a man with it and shot at the man, shot the phone the man had with the gun, and that he had thought at the time the cops had the shell casings and so he was mailing the gun back to her to hide and she did not want any part of it. She did not want the gun delivered to her house be \*ause she was scared for her and her children.**

Tr. 214. The trial court admitted these statements as nonhearsay since they were not admitted for the stated purpose of proving the truth of the matter asserted but to explain the subsequent actions of the witness. However, Brentlinger claims that these statements were largely irrelevant for the stated purpose of explaining Pearson's subsequent conduct and highly relevant for the purpose of demonstrating his guilt or innocence. Brentlinger claims that the prejudicial nature of these statements requires that his convictions be reversed. We disagree.

{¶ 43} This analysis requires us to perform two steps. First, we will determine whether these statements were properly admitted under the rules of evidence as nonhearsay. If Pearson's trial testimony does, in fact, contain hearsay statements, we will consider whether these statements had a prejudicial impact on the trial. Second, we will then determine whether admission of these statements violated Brentlinger's rights as guaranteed under the Confrontation Clause of the United States Constitution.

### Hearsay Standard of Review

{¶ 44} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "A statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted." *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118, citing *State v. Davis*, 62 Ohio St.3d 326, 343, 581 N.E.2d 1362 (1991). Testimony is nonhearsay "when introduced to show its effect on the listener." *Osie* at ¶ 122. "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom

17

the statement was directed." *State v. Wendel*, 2016-Ohio-7915, 74 N.E.3d 806, ¶ 10, quoting *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 59. Generally, "[t]estimony offered to explain the investigative activities of witnesses * * * is admissible." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 98, quoting *Thomas* at 232, 400 N.E.2d 401.

{¶ 45} However, "the well-worn phrase 'not offered for the truth of the matter asserted' is not a talismanic incantation that opens the door to everything said outside the courtroom." *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 25, quoting *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442 (6th Dist.). "Despite a professed nonhearsay use, if the statement's content could also cut toward proof of guilt, the potential for abuse is great." *Richcreek* at ¶ 24, citing *State v. Blanton*, 184 Ohio App.3d 611, 2009-Ohio-5334, 921 N.E.2d 1103, ¶ 38–39, and *State v. Blevins*, 36 Ohio App.3d 147, 149–150, 521 N.E.2d 1105 (1987). *See Ricks* at ¶ 26. However, if the testimony goes beyond what is necessary to explain the subsequent conduct of the witness, the testimony may become "more prejudicial than probative * * *." *Ricks* at ¶ 26. In these situations, "the jury is more likely to rely on the testimony to prove the matter asserted, which tilts the particular testimony into hearsay." *Id.*

{¶ 46} "[T]he admissibility of relevant evidence rests within the sound discretion of the trial court." *State v. Rollison*, 3d Dist. Marion 9–09–51, 2010-Ohio-2162, 2010 WL 1948358, ¶ 32, citing *City of Columbus v. Taylor*, 39 Ohio St.3d 162, 164, 529 N.E.2d 1382 (1988). In the absence of an abuse of discretion and a showing of material prejudice, "an appellate court will not disturb a trial court's ruling as to the admissibility of evidence." *Id.*, citing *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). *See Wendel* at ¶ 5; *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97. "An abuse of discretion has been described as an unreasonable, arbitrary or unconscionable decision." *State v. Harris*, 3d Dist. Hancock No. 5–99–14, 1999 WL 797159 (Sept. 30, 1999).

Hearsay Analysis

{¶ 47} In this case, the trial court admitted Lynette's out-of-court statements to allow Pearson to explain her actions and not for the truth of the matter asserted. When Lynette asked Pearson to intercept a package coming to her house, Pearson needed more information in order to undertake this requested course of action. The fact that Brentlinger told Lynette that he "was mailing a gun back to their house that he had used in a crime in Ohio" was necessary information for Pearson to have if she was going to intercept these two packages. Tr. 213. The statements that Lynette disclosed to Pearson also became a basis of the subsequent investigation into the contents of these packages. Tr. 214. If the jurors were not given this information, Pearson's

conduct and the resulting investigation may seem intrusive or illegitimate. Further, after defense counsel objected to these statements as hearsay, the prosecution explained that these statements were not being offered for the truth of the matter asserted, prompting the court to issue a limiting instruction to the jurors that explained the purpose of these statements. Tr. 213.

{¶ 48} While the first sentence of the challenged statement was unquestionably necessary to understand Pearson's subsequent conduct, Pearson's further statements connecting Brentlinger to specific crimes committed in Ohio may have gone beyond what was absolutely necessary to explain her actions to the jury and provide a foundation for the resulting investigation. Even if this is the case, however, any error in admitting Lynette's out-of-court statements in this case was harmless. "[T]he accused has a constitutional guarantee to a trial free from prejudicial error, not one necessarily one free of all error." *State v. Gill*, 8th Dist. Cuyahoga No. 62323, 1993 WL 135829 (April 29, 1993), quoting *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992).

> **Under Evid.R. 103(A) and Crim.R. 52(A), we disregard as harmless the admission of improper hearsay evidence unless a substantial right of the party is affected. "Substantial rights are not affected 'where the remaining evidence constitutes overwhelming proof of a defendant's guilt * * *.'"**

*State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, 2015 WL 1288147, ¶ 60 (citations omitted).

{¶ 49} In this case, the challenged statements comprise two sentences stated in the course of a trial that lasted for four days. Doc. 232. *See Blevins*, *supra*, at 149–150, 521 N.E.2d 1105. Here, the record contains other compelling evidence that supports these convictions, including Brentlinger's statements on the stand and in multiple recorded conversations. His own statements admit various elements of the offenses with which he was charged, verify portions of Croft's story, and corroborate much of the content of Lynette's out-of-court statements. Tr. 448, 451, 458, 469, 483, 495. Ex. 15–19. Further, "[t]here is no indication that the prosecution 'planted' this testimony or attempted to capitalize on it. It is more likely * * * [that the witness] 'blurted out' what [she] considered to be the reasons for [the] investigation." *Gill* at 3.

Confrontation Clause Standard of Review

{¶ 50} We now determine whether these statements were admitted in violation of the Confrontation Clause. The United States Constitution

> **guarantees the right of defendants in criminal cases "to be confronted with the witnesses against him." *Crawford* at 38 [124 S.Ct. 1354]. Since a witness is a person who "bear[s]**

> **testimony,"** *Id.* **at 51 [124 S.Ct. 1354], quoting 2 N. Webster, An American Dictionary of the English Language (1828), "the Confrontation Clause applies only to testimonial statements."** *State v. Muttart,* **116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59, citing** *State v. Stahl,* **111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 15.**

*State v. Little,* 2016-Ohio-8398, 78 N.E.3d 323, ¶ 17.

{¶ 51} "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford v. Washington,* 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), quoting 2 N. Webster, An American Dictionary of the English Language (1828). "[I]f [a witness's] testimony regarding [an out-of-court declarant's] statements [were] not offered to prove the truth of the matter asserted, then it did not violate [the defendant's] right to confront witnesses." *Ricks* at ¶ 18. *See Crawford* at 59, 124 S.Ct. 1354, fn. 9, citing *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). "[W]e review de novo evidentiary rulings that implicate the Confrontation Clause." *McKelton, supra,* at ¶ 97, citing *United States v. Henderson,* 626 F.3d 326, 333 (6th Cir. 2010).

Confrontation Clause Analysis

{¶ 52} In this case, Lynette's out-of-court statements were not, according to the prosecution, "offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Since testimony is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact," the statements that were necessary to explain Pearson's subsequent conduct are, by definition, nontestimonial because their purpose was not to prove the truth of the matter asserted. *Crawford* at 51, 124 S.Ct. 1354, quoting 2 N. Webster, An American Dictionary of the English Language (1828). *See Davis v. Washington,* 547 U.S. 813, 823, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Thus, the statements that were necessary to establish the reasons for Pearson's subsequent actions do not fall within the scope of the Confrontation Clause.

{¶ 53} As to the portion of Pearson's testimony which may have gone beyond what was necessary to explain Pearson's subsequent actions, the admission of these statements still does not implicate the Confrontation Clause. The Ohio Supreme Court has adopted the objective witness test to determine whether statements between people outside of law enforcement are testimonial. Under this test, testimonial statements are those

> **made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."** *Crawford,* **541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. In determining whether a statement is testimonial for**

20

> **Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations.**

*State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36.

> {¶ 54} Under this test, the out-of-court statements that Lynette made to Pearson are all nontestimonial. Since Pearson delivered mail to the Brentlingers' house, Lynette and Pearson were acquainted with one another. On hearing from her husband, Lynette did not contact the police or give a statement to law enforcement. Rather, she contacted a familiar acquaintance to help address a specific problem. At the time of this conversation, it appears that her focus was on resolving the issues presented by having a gun used to commit a crime shipped to her house. We do not see any indication that her mind was contemplating the prospect of her statements being used in a criminal action. Further, according to Pearson, Lynette's expressed concern at the time of this conversation was the safety of her home and children. Tr. 214. Consequently, these statements did not violate Brentlinger's right to confrontation even if Pearson's statements gave more information than the circumstances of the trial necessitated. For these reasons, we overrule Brentlinger's third assignment of error.

*State v. Brentlinger*, 90 N.E.3d at 216-20 (emphasis in original) (footnotes omitted).

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused, applicable to the States by way of the Fourteenth Amendment, "to be confronted with the witnesses against him." U.S. Const. Amend. VI.  As the United States Supreme Court has explained, "the right of confrontation 'means more than being allowed to confront the witness physically.'"  *Van Arsdall*, 475 U.S. at 678 (quoting *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).  *See also Blackston v. Rapelje*, 780 F.3d 340, 349 (6th Cir. 2015).  Rather, "'[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Id*. at 315–316 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in original).  But, as the Supreme Court has explained, the Confrontation Clause "'guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"

21

*Bugh v. Mitchell*, 329 F.3d 496, 506 (6th Cir. 2007) (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court "adopted a different approach" regarding the admission of out-of-court statements by an unavailable witness:

> We explained that "witnesses," under the Confrontation Clause, are those "who bear testimony," and we defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.,* at 51, 124 S.Ct. 1354 (internal quotation marks and alteration omitted). The Sixth Amendment, we concluded, prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.,* at 54, 124 S.Ct. 1354. Applying that definition to the facts in *Crawford,* we held that statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. But our decision in *Crawford* did not offer an exhaustive definition of "testimonial" statements. Instead, *Crawford* stated that the label "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.,* at 68, 124 S.Ct. 1354.

*Ohio v. Clark*, 576 U.S. 237, 135 S.Ct. 2173, 2179, 192 L.Ed.2d 306 (2015).  "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ."  *Crawford*, 541 U.S. at 68.

The *Clark* Court explained subsequent case law following *Crawford* that "labored to flesh out what it means for a statement to be 'testimonial,'" and stated, "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'"  135 S.Ct. at 2179-80.  The Supreme Court determined "Thus, under our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial.  'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."  *Id.*

In *Clark*, the Supreme Court considered for the first time statements made to persons outside of law enforcement; specifically, statements made by a child to preschool teachers.  *Id.* at 2181.  The

Supreme Court declined to "adopt a categorical rule excluding" statements made "to individuals who are not law enforcement officers" "from the Sixth Amendment's reach," as "at least some statements" made to such individuals "could conceivably raise confrontation concerns." *Id.*  However, "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.*  The Supreme Court concluded, "[C]onsidering all the relevant circumstances here, L.P's statements clearly were not made with the primary purpose of creating evidence for Clark's prosecution.  Thus, their introduction at trial did not violate the Confrontation Clause." *Id.*

With respect to Mrs. Brentlinger's out-of-court statements that were necessary to explain Pearson's subsequent actions, Brentlinger fails to demonstrate the state appellate court's determination on this issue was contrary to, or an unreasonable application of, clearly established federal law.  The state appellate court determined that because these statements were not offered for the truth of the matter asserted, they were, "by definition, nontestimonial," thus falling outside the ambit of the Confrontation Clause, citing to the Supreme Court's decisions in *Crawford* and *Davis v. Washington*, 547 U.S. 813, 823 (2006).  *State v. Brentlinger*, 90 N.E.3d at 219.  Brentlinger fails to address this portion of the state appellate court's decision.  (Doc. Nos. 1, 8.)  The Supreme Court's decision in *Clark* did not alter or overrule its decisions in *Crawford* and *Davis*, and Brentlinger has failed to show the state appellate court's decision was contrary to, or an unreasonable application of, the holdings of these cases.

With respect to "the portion of Pearson's testimony which may have gone beyond what was necessary to explain Pearson's subsequent actions," *Brentlinger*, 90 N.E.3d at 219, Brentlinger likewise fails to demonstrate the state appellate court's determination on this issue was contrary to, or an unreasonable application of, clearly established federal law.  Brentlinger is correct that, as this case involves statements made to an individual who was not a law enforcement officer, *Clark* controls.  Brentlinger is also correct that, in *Clark*, the Supreme Court utilized the "primary purpose" test to

23

determine whether the statements in *Clark* were testimonial.  Here, the state appellate court utilized the test adopted by the Ohio Supreme Court – "the objective witness test" – for determining whether statements "between people outside of law enforcement are testimonial." *Brentlinger*, 90 N.E.3d at 219. "Under this test, testimonial statements are those made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* (quoting *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36 (Ohio 2006)).[3]  But Brentlinger fails to establish that the outcome of the objective witness test, in the context of this case, is contrary to the outcome of the primary purpose test.  *See State v. Cook*, 2019-Ohio-3650, 2019 WL 4303435, at *6 (Ohio Ct. App. Sept. 9, 2019) ("While described differently, in the context of this case the 'objective witness' test is sufficiently similar to the *Clark* 'primary purpose' test as both focus upon the intent of the declarant . . . .").

As the Supreme Court explained in *Clark*: "Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. See *id.,* at 369, 131 S.Ct. 1143. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. *See*, *e.g., Giles,* 554 U.S., at 376, 128 S.Ct. 2678." 135 S. Ct. at 2182.  Furthermore:

> Our Confrontation Clause decisions, however, do not determine whether a statement is testimonial by examining whether a jury would view the statement as the equivalent of in-court testimony. The logic of this argument, moreover, would lead to the conclusion that virtually all out-of-court statements offered by the prosecution are testimonial. The prosecution is unlikely to offer out-of-court statements unless they tend to support the defendant's guilt, and all such statements could be viewed as a substitute for in-court testimony. We have never suggested, however, that the Confrontation

---

[3] In *State v. Stahl*, the Ohio Supreme Court cited *Crawford* for this test.  *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36 (Ohio 2006).  In *Crawford*, the United States Supreme Court identified "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'" as a "formulation" of "this core class of 'testimonial' statements." 541 U.S. at 51-52 (citation omitted).

> Clause bars the introduction of all out-of-court statements that support the prosecution's case. Instead, we ask whether a statement was given with the "primary purpose of creating an out-of-court substitute for trial testimony." *Bryant, supra,* at 358, 131 S.Ct. 1143. Here, the answer is clear: L.P.'s statements to his teachers were not testimonial.

*Id.* at 2183.

Consistent with the Supreme Court's explanation in *Clark*, the state appellate court focused on Pearson's identity as the person to whom Mrs. Brentlinger made the out-of-court statements and the purpose for Mrs. Brentlinger making the statements to Pearson:

> {¶ 54} Under this test, the out-of-court statements that Lynette made to Pearson are all nontestimonial. Since Pearson delivered mail to the Brentlingers' house, Lynette and Pearson were acquainted with one another. On hearing from her husband, Lynette did not contact the police or give a statement to law enforcement. Rather, she contacted a familiar acquaintance to help address a specific problem. At the time of this conversation, it appears that her focus was on resolving the issues presented by having a gun used to commit a crime shipped to her house. We do not see any indication that her mind was contemplating the prospect of her statements being used in a criminal action. Further, according to Pearson, Lynette's expressed concern at the time of this conversation was the safety of her home and children. Tr. 214. Consequently, these statements did not violate Brentlinger's right to confrontation even if Pearson's statements gave more information than the circumstances of the trial necessitated. For these reasons, we overrule Brentlinger's third assignment of error.

*Brentlinger*, 90 N.E.3d at 220.

At trial, Pearson testified she had delivered mail to the Brentlingers' house for approximately ten years.  (Doc. No. 6-2, PageID #390.)  Pearson testified to her relationship with Lynette Brentlinger as follows:

> Q:  And do you know her very well?
>
> A:  Yes.
>
> Q:  And how do you know her?
>
> A:  Our kids attended pre-school together at C.C.S., Christian Community School, for a couple of years.

25

Q:  All right. Other than that, do you socialize with the Brentlingers?

A:  I see her at church occasionally now.

Q:  Okay. Have you ever been to parties? By socialize, have you ever been together with them?

A:  No.

(*Id.* at PageID #385.)   As the state appellate court noted, after hearing from Brentlinger, Lynette Brentlinger "did not contact the police or give a statement to law enforcement.  Rather, she contacted a familiar acquaintance to help address a specific problem."  *Brentlinger*, 90 N.E.3d at 220.   Mrs. Brentlinger's focus appeared to be "on resolving the issues presented by having a gun used to commit a crime shipped to her house."  *Id.*  The state appellate court found no indication from this conversation that Mrs. Brentlinger's "mind was contemplating the prospect of her statements being used in a criminal action." *Id.*

Pearson's obligation to report what Mrs. Brentlinger told her to her superiors at the Post Office does not change the analysis.  As the Supreme Court explained in *Clark*:

> [M]andatory reporting statutes alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution.
>
> It is *irrelevant* that the teachers' questions and their duty to report the matter had the natural tendency to result in Clark's prosecution.

*Clark*, 135 S. Ct. at 2183 (emphasis added).

Under the circumstances of this case, the Court cannot say that the state appellate court's decision was contrary to, or an unreasonable application of, clearly established federal law.  However, even if it was contrary to, or an unreasonable application of, clearly established federal law for the state appellate court not to cite *Clark* and apply the "primary purpose" test, "this simply means that [Brentlinger] is entitled to de novo review" of his Confrontation Clause claim.  *Jones v. Bagley*, 696 F.3d 475, 490 (6th Cir. 2012).  After *de novo* review, for the reasons set forth above, the Court concludes the portion of

26

Pearson's testimony which may have gone beyond what was necessary to explain her subsequent actions were nontestimonial and did not violate Brentlinger's rights under the Confrontation Clause.

### b.  Due Process Clause

As a general rule, an error of state law in the admissibility of evidence does not constitute an infringement of a right guaranteed under the United States Constitution and is not cognizable in habeas corpus.  *See Bugh*, 329 F.3d at 512; *Byrd v. Collins*, 209 F.3d 486, 528 (6th Cir.2000).  However, the Sixth Circuit has explained that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh,* 329 F.3d at 512. *See also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000).  The Sixth Circuit has cautioned that "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Bugh*, 329 F.3d at 512 (citations omitted).  *See also Dowling v. United States*, 493 U.S. 342, 352–53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *Burger v. Woods*, 515 F. App'x 507, 509-10 (6th Cir. 2013) ("A due process claim premised on a mistaken state court evidentiary ruling faces a steep climb.").  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)).  "Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause."  *Wilson v. Sheldon*, 874 F.3d 470, 476 (6th Cir. 2017) (citing *Seymour v.* Walker, 224 F.3d 542, 552 (6th Cir. 2000)). Moreover, in order to obtain habeas relief in this context, a petitioner must establish "actual prejudice" from the admission of the allegedly improper evidence.  *Clemmons v. Sowders*, 34 F.3d 352, 357–58 (6th Cir. 1994).  *See also Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (petitioner must show that

27

admission of improper evidence is "material in the sense of a crucial, critical highly significant factor"); *Burger,* 515 F. App'x at 510 (same).

Although he invokes the Due Process Clause in Ground One, Brentlinger fails to assert that the admission of the statements which may have gone beyond what was necessary to explain Pearson's subsequent actions was so egregious that it resulted in a denial of fundamental fairness. Nor does he direct the Court to any United States Supreme Court authority directly supporting his argument that the admission of this evidence rises to the level of a due process violation. Brentlinger also fails to address the state appellate court's harmless error determination.[4] *See Wilson*, 874 F.3d at 477 ("We also note that even if the Ohio state courts were to have found that the officers' testimony constituted hearsay, while we would not condone its admission, we would not question a state supreme court's determination that the error was harmless.") (citing *Olson v. Little*, 604 F. App'x 387, 406 (6th Cir. 2015)). Furthermore, Brentlinger fails to argue or show that he was "actually prejudiced" by the admission of this evidence. First, the trial court issued a limiting instruction after defense counsel's objection (Doc. No. 6-2, PageID #386), and juries are presumed to follow its instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Second, there was ample evidence outside of these statements – including from Brentlinger himself – that he committed the crimes for which he was convicted.

---

[4] In concluding any evidentiary error was harmless, the state appellate court explained:

> In this case, the challenged statements comprise two sentences stated in the course of a trial that lasted for four days. Doc. 232. *See Blevins*, *supra*, at 149–150, 521 N.E.2d 1105. Here, the record contains other compelling evidence that supports these convictions, including Brentlinger's statements on the stand and in multiple recorded conversations. His own statements admit various elements of the offenses with which he was charged, verify portions of Croft's story, and corroborate much of the content of Lynette's out-of-court statements. Tr. 448, 451, 458, 469, 483, 495. Ex. 15–19. Further, "[t]here is no indication that the prosecution 'planted' this testimony or attempted to capitalize on it. It is more likely * * * [that the witness] 'blurted out' what [she] considered to be the reasons for [the] investigation." *Gill* at 3.

*Brentlinger*, 90 N.E.3d at 218.

At trial, recordings of previous statements Brentlinger made were introduced, including a conversation between him and Croft where Brentlinger told Croft: "What happened the other night, my friend, was an act of God that you didn't wind up dead on the side of the highway. Okay? That was God saving your life from me killing you.  Okay? The first thing you need to do is get on your knees and thank Jesus because you're still alive.  That was Him that saved your live not me * * *."  *Brentlinger*, 90 N.E.3d at 216.  Brentlinger also implied he took Croft's cell phone, telling Croft his media card "was 'in front of an f'ing snow plow somewhere in Cleveland.'"  *Id.* at 215.

Brentlinger took the stand in his own defense.  (Doc. No 6-2, PageID #584.)   While he disputed certain parts of Croft's testimony, he admitted to asking Croft to get out of his vehicle at gunpoint, he admitted to firing his gun, and he admitted to an altercation with Croft.  (*Id.* at PageID #627, 634, 645.) He also admitted to disassembling one of his guns and mailing it (minus the barrel and a slide receiver or ejector) to his house in Tennessee, although he denied that it was the same gun he fired during the altercation with Croft.  (*Id.* at PageID #631, 645.)

In light of the above, the Court finds that any error in the admission of Pearson's testimony that "may have gone beyond what was absolutely necessary to explain her actions to the jury and provide a foundation for the resulting investigation," *Brentlinger*, 90 N.E.3d at 218, was not so egregious so as to deny him fundamental fairness.

Accordingly, and for all the reasons set forth above, Brentlinger's sole ground for relief is without merit.

### IV.    Motion to Expand

Brentlinger seeks to expand the record to include a sworn letter to The Innocence Project from former Allen County Sheriff Daniel Beck dated October 28, 2019.  (Doc. Nos. 10, 10-1.)  In the affidavit, Mr. Beck avers "[t]he three main people involved" in Brentlinger's case, Sheriff Sam Crish, Lt. Mark

Baker, and Joseph Croft, the victim, "are closely connected personally." (Doc. No. 10-1 at 1.)  Mr. Beck states that the purpose of his letter "is to register [his] concern about the inordinate amount of time to which **John Brentlinger, Jr.** was sentenced in the case where the alleged victim was **Joe Croft**." (*Id.*) (emphasis in original).  Brentlinger argues this information is relevant because in its analysis of Pearson's testimony under "Ohio's hearsay rule," the state appellate court's harmless error determination was based on "'other compelling evidence that supports these convictions.'"  (Doc. No. 10 at 2.)  Presumably addressing the diligence requirement for expansion of the record, Brentlinger maintains, "As applied to the facts of this case, Brentlinger had no way of knowing that Mr. Beck had close, personal knowledge of the interactions between the disgraced former Sheriff, Sam Crish, the lead investigator, Lt. Mark Baker, and the alleged victim Joey Croft.  Moreover, Brentlinger had no way of compelling Mr. Beck to provide an affidavit regarding facts that Brentlinger was unaware Mr. Beck knew." (*Id.* at 4.)

Respondent opposes the motion to expand, asserting, "Contrary to Brentlinger's arguments, he has not established an exception to the *Cullen v. Pinholseter*, 563 U.S. 170 (2001) limitation that prevents review of records outside the state court record in habeas proceedings." (Doc. No. 11 at 3.)

Rule 7 of the Rules Governing Section 2254 Cases provides that "the Court may direct the parties to expand the record by submitting additional materials relating to the petition."  Rules Governing § 2254 Cases, 28 U.S.C. § 2254 (2010).  "The decision of whether to expand the record, however, is within the sound discretion of the district court."  *West v. Bell*, 550 F.3d 542, 551 (6th Cir. 2008).  Because "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," a federal habeas court may only review evidence in the record at the time of the state court proceedings.  *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011); *Black v. Bell*, 664 F.3d 81, 91 (6th Cir. 2011).

This Court recently explained:

30

Motions to expand the record under Rule 7 must meet the standards of AEDPA's § 2254(e)(2), although that provision is expressly directed only at evidentiary hearings. *Holland v. Jackson,* 542 U.S. 649, 653 (2004) (per curiam) ("Those same restrictions [of § 2254(e)(2)] apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing." (emphasis original)). Section 2254(e)(2) precludes an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings" unless the applicant satisfies certain conditions. 28 U.S.C. § 2254(e)(2).

Under AEDPA, therefore, a prisoner may introduce new evidence in support of a claim in the district court "only if [the prisoner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland,* 542 U.S. at 652–53. A prisoner is at fault in failing to develop the evidence if there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). The required diligence is "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. "[C]omity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2)." *Id.*

*McNeill v. Bagley*, No. 1:02 CV 1645, 2018 WL 3348876, at \*\*8–9 (N.D. Ohio Jul. 9, 2018) (footnote omitted).

Expanding the record for limited purposes, however, falls within the discretion of the district court. *See e.g., Gordon v. Turner*, 2015 WL 3969689, at \*5 (N.D. Ohio June 30, 2015); *Conway v. Houk*, 2011 WL 249491, at \*2 (S.D. Ohio Jan. 26, 2011) (limiting inquiry, in resolving a motion to expand the record, to "whether the materials that Petitioner seeks to add to the record would assist the Court in determining whether an evidentiary hearing might be warranted"); *Keenan v. Bagley*, 2008 WL 4372688, at \*2 (N.D. Ohio Sep. 22, 2008) (granting motion to expand the record for limited purpose of determining whether the petitioner had exercised diligence in developing the factual record in state court, but "reserv[ing] the right to exclude this evidence from consideration when it reaches the merits of [the petitioner's] claims").

31

Brentlinger is at fault for failing to develop the factual basis of any claim relating to the information in state court proceedings.  First, as Respondent asserts, "Brentlinger has not diligently sought to develop any claims in state court based on the information contained in [Beck]'s] October 28, 2019 affidavit."  (Doc. No. 11 at 3.)  While he filed a motion to expand the record in *this* Court in November 2019, he has not filed any motions or petitions relating to this letter in state court.  (*See* https://courtvweb.allencountyohio.com/eservices/search.page.8?x=bc6sEPhdz7tfR5qCM0D7Pd-- LxTChfE4zuuwdEZC**7sqfNqtQtNb5H0mLg2jqhvOucQXvAHnnXFYN4IGWEiQA)    (last visited on April 21, 2020).  Rule 33(A)(6) of the Ohio Rules of Criminal Procedure allows for a new trial to be granted on motion of the defendant "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."  Ohio R. Crim. P. 33(A)(6).  Rule 33 further provides that such motions "shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period."  Ohio Crim. R. 33(B).  Therefore, Brentlinger is at fault in failing to develop the evidence because of his lack of diligence in developing the factual basis of this claim in state court proceedings.  *McNeill*, 2018 WL 3348876, at *9 ("The required diligence is 'a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.' *Id*. at 435. 'Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law.'") (quoting *Williams v. Taylor*, 529 U.S. 420, 435, 437 (2000)).  *Cf. Williams*, 529 U.S. at 443-44.[5]

---

[5] The Supreme Court "note[d]" that the Commonwealth had not argued that Williams "could have sought

Second, as Beck's letter makes clear, Brentlinger's father served as Beck's campaign chairman from 1993 to 2008.  (Doc. No. 10-1 at 1.)  As Respondent asserts, "Brentlinger was convicted in 2016, Beck was a known associate of Brentlinger's family many years before that, and Brentlinger was not duly diligent in waiting until 2019 to pursue an affidavit."  (Doc. No. 11 at 3-4.)  Brentlinger does not deny Respondent's claim, but rather argues, "[R]egardless of any family relationship that existed between [Beck] and Brentlinger does not infer that Mr. Beck shared any intimate details of his . . . knowledge of the interworking's [sic] of the Police Department or the connection between the disgraced former Sheriff, Sam Crish, the lead investigator, Lt. Mark Baker, and the alleged victim Joey Croft."  (Doc. No. 12 at 3.)  But that does not mean, especially in light of his family's relationship with Beck and Beck being former sheriff of Allen County, that Brentlinger should not have reached out to Beck in his own diligent search for evidence.  *Williams*, 529 U.S. at 435 ("The purpose of the fault component of 'failed' is to ensure the prisoner undertakes his own diligent search for evidence.").  Therefore, the Court cannot say, based on the information before it, that Brentlinger was diligent in his efforts to discover the facts contained in Beck's letter.  As a result, unless Brentlinger meets the conditions set forth in 28 U.S.C. § 2254(e)(2), this Court cannot examine the evidence set forth in Beck's letter in considering Brentlinger's habeas petition.  *Id.*

Under § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> > (A) the claim relies on--

---

relief in state court once he discovered the factual bases of these claims…."  *Williams*, 529 U.S. at 443. Furthermore, "[a]s state postconviction relief was no longer available at the time the facts came to light, it would have been futile for petitioner to return to the Virginia courts.  In these circumstances, though the state courts did not have an opportunity to consider the new claims, petitioner cannot be said to have failed to develop them in state court by reason of having neglected to pursue remedies available under Virginia law."  *Id.* at 444.

> (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Even assuming, *arguendo*, the information in Beck's letter could not have been discovered, whether there was diligence or not, and therefore meets the criteria of § 2254(2)(A)(ii), *Williams*, 529 U.S. at 435, he cannot meet the requirements in § 2254(2)(B).  Brentlinger asserts in his reply, "To be clear, Brentlinger's entire argument before this Court is based on the potential connection between the disgraced former Sheriff, Sam Crish, the lead investigator, Lt. Mark Baker, and the alleged victim Joey Croft." (Doc. No. 12 at 3.)  But this statement is belied by his Petition and his Traverse, which focus solely on the admission of statements by Lynette Brentlinger as relayed through Pearson's testimony, not the other evidence in his case or the integrity of the investigation that led to his conviction.  As discussed in detail above, other evidence supported his convictions, not the least of which included his own testimony at trial. Furthermore, according to Beck himself, the purpose of the letter was to "register" his "concern about the inordinate amount of time to which [Brentliner] was sentenced . . . ." – not Brentlinger's underlying conviction itself.  Therefore, for all these reasons, Brentlinger fails to show the facts presented in Beck's letter would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty.

Because Brentlinger fails to meet the criteria set forth in § 2254(e)(2), his Motion to Expand the Record (Doc. No. 10) is DENIED.

34

## V. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.  Brentlinger's Motion to Expand the Record (Doc. No. 10) is DENIED.


Date:  May 6, 2020                                   *s/ Jonathan Greenberg*
                                                     Jonathan D. Greenberg
                                                     United States Magistrate Judge


## <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**